ARTHUR KING, Respondent, *v.* CHARLES N. TALBOT, Executor, &c., and DAVID W. OLYPHANT, Administrator of David W. C. Olyphant, Executor of Charles W. King, deceased, Appellants.

ANNA HENRIETTA KING, Respondent, *v.* The Same, Appellants.

CHARLOTTE E. KING, Executor of William V. King, deceased, Respondent, *v.* The Same, Appellants.

The law, in this State, imposes upon trustees, holding trust funds for investment for the benefit of minor children, to be supported from the income accruing therefrom, the duty of placing them in a state of security, of seeing that they are productive of interest, and of so keeping them, that they may always be subject to future recall, for the benefit of the cestui que trust.

The investment of such funds by a trustee in canal, bank, insurance, railroad or other stocks of private corporations, is a violation of his duty and the obligation of his trust.

As to moneys held upon trust of this kind, it is not according to the nature of the trust, nor within any just idea of prudence, to place the principal of the fund in a condition, in which it is necessarily exposed to the hazard of loss or gain, according to the success or failure of the enterprise in which it is embarked, and in which, by the *very terms of the investment*, the principal is not to be *returned* at all.

Accordingly, *Held*, (all the judges concurring,) that where the interest upon certain legacies were, by the terms of the will, to be applied by the executors, so far as required, to the maintenance and education of the legatees during their minority, and the principal, with any accummulations thereon, to be paid to them severally on their coming of age, and the executors, upon whom the trust was imposed, invested the funds in stocks of the Delaware and Hudson Canal Company, the New York and Harlem Railroad Company, New York and New Haven Railroad Company, the Bank of Commerce, and the Saratoga and Washington Railroad Company, the legatees, upon coming of age, were not bound to accept such investments, but had the right to call upon the executors to pay over the whole amount of their legacies and interest thereon.

*Held* further, that the proper rate of interest, with which the executors are to be charged in such case, is *six per cent* with annual rests.

The proper mode of making up the interest account upon this basis, where the executors have made advances for the maintenance of the legatees during their minority, stated.—WOODRUFF, J.

*It seems*, that cestui que trusts, in the case of improper investments, which are divisible, are not limited to rejection of *all* or *none* of them, but may accept such as they choose and reject the others.—WOODRUFF, J.

Where no provision is made by a testator for the support of his minor children, other than by the income to be derived from the legacies bequeathed to them, as between the legatees and the estate, such legacies draw interest from the death of the testator.

In this State, a trustee holding funds for investment for the benefit of minor children, must invest in Government or real estate securities. Any other investment would be a breach of duty and the trustee personally liable.—MURRAY, GROVER, DANIELS and JAMES, J. J. Contra HUNT, Ch. J., MASON and LOTT, J. J.

(These appeals were argued together on the 6th day of January, 1869, and decided on the 18th of March, 1869.)

THESE were actions brought separately by William Vernon King, Anna Henrietta King, and Arthur King, the three children of Charles W. King, deceased, against the surviving executor and the administrator of a deceased executor of said Charles, for an account of the moneys due them respectively, for the principal and accumulations of their respective legacies under their father's will, and for the payment over of the amounts found due. The causes were tried together at Special Term, before a justice of the Supreme Court, from whose decrees, all parties appealed to the General Term, where they were affirmed, without costs of appeal. The defendants appealed to this court. The plaintiffs also brought cross-appeals from that part of the decrees, allowing interest to the defendants on their payments for maintenance of the plaintiffs, postponing interest on the legacies, until a year from the testator's death, and some other minor credits.

William Vernon King died after the commencement of his action; and his executrix was substituted as the plaintiff.

Charles W. King, the father, died on a voyage from Ceylon to Suez, September 26, 1845, leaving a widow and these three children, all then infants. By his will, made at Macao, he bequeathed to each of his three children the sum of $15,000; " the interest on the same, so far as required, to be applied to their maintenance and education, and the principal, with any

accumulations thereon, to be paid to them severally on their majority." He entrusted to the "discretion" of his executors, " the settlement of my affairs and the investment of my estate for the benefit of my heirs." The defendants named, and who qualified as his executors, had been his partners in business, both at New York, and in China.

The will was proved abroad, and letters issued December 5th, 1846. The executors, prior to December 31st, 1849, had possessed themselves of the estate, to the amount of over $105,000. On the 16th of December, 1847, they filed an inventory amounting to over $106,000. They did not collect or have in their hands for investment so large an amount as $45,000 until June 9th, 1847. No account has ever been rendered by them to the surrogate of their administration.

Between March 5th and December 19th, 1847, the executors invested in United States treasury notes and Ohio State bonds, a sum exceeding $45,000 of the moneys of the estate. Between August 1st, 1848, and November 10th, 1849, they sold $41,986 of said investment, at a profit of $1,312.77, and reinvested the money realized from such sales in Delaware and Hudson Canal Company stocks, Saratoga and Washington Railroad Company stocks, New York and New Haven Railroad Company stocks, Harlem Railroad Company stocks, Hudson River Railroad Company bonds, and Bank of Commerce stock and scrip, for account of the children.

On the 1st day of April, 1850, they set apart for the children, as an investment of their legacies, the following stocks and bonds, constituting a portion of the aforesaid investments, at an estimated valuation equal to the price paid by them:

$4,000 of Ohio 7 per cent stocks, at 103, and ¼
  brokerage .............................. $4,130 00

$3,500 of Ohio 5 per cent stocks, at 92, and ¼
  brokerage .............................. 3,228 75

45 shares of the stock of the Delaware and
  Hudson Canal Company, and five shares of
  scrip stock of said company, at ............ 7,758 75

| | |
|---|---:|
| 40 shares Saratoga and Washington Railroad Company stock, at ...................... | $3,411 70 |
| 200 shares preferred stock New York and Harlem Railroad Company, at ................ | 10,025 00 |
| $10,000 in amount in bonds of Hudson River Railroad Company ...................... | 9,687 50 |
| 125 shares of the scrip stock of the Bank of Commerce............................... | 4,306 25 |
| 30 shares stock New York and New Haven Railroad Company....................... | 2,482 50 |
| Making in all........................... | $45,390 45 |

And they opened an account of these investments with the children, and debited it with the $45,390.45, and also the income therefrom, and credited the same with payments made for the support and maintenance of said children. They, on the same day, paid over the balance of the estate to the residuary legatee.

The Ohio 7 per cents were redeemed in January, 1852; and the Ohio 5 per cents were redeemed in January, 1857; and the proceeds invested in Bank of Commerce scrip and New York Central bonds.

It was found by the judge, who tried the causes, that, at the time these investments were made, and at the time said stocks and bonds were set apart, as well as at the time the others were subsequently purchased, the stocks and bonds were in good repute, and were considered by men, upon whose judgment it was proper to rely, as safe and desirable investments. The investments were made and set apart in good faith, the executors having invested their own funds in similar stocks and retained the same.

D. W. C. Olyphant, one of the executors, died in June, 1851, and the defendant Olyphant was appointed administrator of his estate.

The testator made no provision for the support of his children other than that contained in his will. From his

death to April, 1850, they resided with their mother. The income, which had been realized from the investments of the estate up to April 1st, 1850, was divided by the executors between the mother (residuary legatee) and the children, in the proportions in which they were respectively entitled to the estate, and some advances for maintenance of the children made, in addition.

The children now reject the stock investments made by the executors, and claim that the defendants should be made liable for all moneys invested in those stocks, with interest from the death of the testator, and for all profits resulting from their dealings with such moneys, and bring these actions to enforce such claims.

The court, at Special Term, decided, that it was the duty of the executors, within a reasonable time after the receipt of a sufficient amount of funds, belonging to the estate, to invest the amount of the legacies in the stocks of the United States, and of the State of New York, and keep the same so invested ; and, having failed to do so, their investments were invalid, and the executors were personally liable for the amount of the legacies, with compound interest from September 1st, 1846, at 7 per cent. It also held, that the conduct of the executors was in good faith, and without fraud ; the children must, therefore, reject *all* or *none* of the investments ; and that the executors were entitled to commissions. It was referred to a referee, to make up an account, charging the executors with the legacies, on the 26th of September, 1846 (one year from the death of the testator), and with interest thereon, at 7 per cent, from that date, *computed with annual rests*. The referee stated an account upon this basis, crediting the executors with their payments, for maintenance and support of the children, each year, and interest on such payments, from the date of each, to the ensuing 26th of September, when such payments, with the commissions and interest, were deducted from the amount of the legacies, and the year's interest then accrued upon them, and the executors were debited with the balance, as a new principal. From that,

increased by a year's interest thereon, to the ensuing 26th of September, again, the amount of their payments in the meantime, with interest and commissions, were deducted, leaving a new principal, and so on to the final balance.    The decree was entered in accordance with this report.

*Stephen P. Nash*, for the appellants, insisted, that there was no rule of law in this State, making the investment by a trustee, in any particular security, of itself, a breach of trust; and that if the trustee acts with prudence and in good faith, he is protected.    The rule in England, as to investments, is not a rule of the common law, but merely local, and not applicable to this country.    Upon this point, he cited *Lowell* v. *Minot* (20 Pick., 119); *Harvard College* v. *Amory* (9 Pick., 446); *Hancom* v. *Allen* (2 Dickens, 498); *Trafford* v. *Boehm* (7 Vesey, 151); *Howe* v. *Earl of Dartmouth*, (7 Vesey, 151); *Smith* v. *Smith* (4 Johns. Ch., 281, 445); *Brown* v. *Campbell* (Hopkins, 233); *White* v. *Parker* (8 Barb., 48, 53); Hoffman's Master, p. 125; *Clarkson* v. *Depeyster* (Hopk., 274). The English rule originated from the statute, 25 Geo. II, ch. 27. Prior to that act, investments in stocks were sanctioned there.

Before Lord St. Leonard's act (23, 24 Vict., ch. 35, § 32), authorizing investments of trust funds on real estate securities; they were not approved in England.    (*Ex parte Calthorpe*, 1 Cox Ch. Cas., 182; *Norbury* v. *Norbury*, 4 Madd., 191; *Raby* v. *Ridehaugh*, 7 De G. M. & G., 104.)

He further insisted, that the *discretion*, given by the will to the trustees, as to investments, left them untramelled, within the bounds of prudence and good faith; and cited *Band* v. *Fardell* (7 De G. M. & G., 628, 632); *Jackson* v. *Jackson* (1 M. & K., 514).

But, if the investments are illegal, and the discretion given by the will is of no force, the executors should not be charged with compound interest.    (*Sir J. Romilly, M. R.*, in *Jones* v. *Foxhall*, 15 Beav., 392; Hill on Trustees [Am. Ed. of '67], 374, and note; *Attorney General* v. *Alford*, 4 De G. M. & G., 843; *Blogg* v. *Johnson*, Law Rep., 2 Ch. Appeals, 225;

*Clarkson* v. *Depeyster*, 2 Wend., 77; *Rapelye* v. *Norsworthy*, 1 Sandf. Ch., 399; *Utica Ins. Co.* v. *Lynch*, 11 Paige, 520, 523, 524; *Lansing* v. *Lansing*, 45 Barb., 182, 191; *Corning* v. *Howard*, 46 id., 579; *Ackerman* v. *Emott*, 4 Barb., 626.)

The *rate* of interest should be less than 7 per cent. (Hill on Trustees, 374; *Williamson* v. *Williamson*, 6 Paige, 298, 308; 7 Ves., 137.) The interest is only chargeable, at all, against the executors, after a year from testator's death. (*Cooke* v. *Meeker*, 36 N. Y., 15; 6 Paige, 298.)

The *cestui que trust* cannot claim profits upon some investments, and reject the others. (*Heathcote* v. *Hulmes*, 1 Jac. & Walker, 122; *Robinson* v. *Robinson*, 1 De G. M. & G, 256; Lewin on Trust., 249.)

*George N. Titus* for respondents, upon the point, that trustees can only invest in State, Federal or real estate securities, cited *Ackerman* v. *Emott*, 4 Barb., 626; *In re* Colne Valley Railway, 1 De Gex. F. & Jones, 53; *Trafford* v. *Boehm* 3 Atk., 441; *Hancom* v. *Allen*, 2 Dick., 498; *Adye* v. *Feuilleteau*, 3 Swanst., 83, *note*; *Clough* v. *Bend*, 3 Mylne & Craig, 491; 7 Ves. 150, Hill on Tr., 376-7; *Bogardus* v. *Trinity, Ch.*, 4 Paige, 198; Laws of 1813, p. 492, sec. 19; 1 Paige, 321, 323; 4 Edw. Ch. R., 722; 4 Johns. Ch., 281; *Salway* v. *Salway*, 2 Russ & M., 218; 2 Story's Eq. Jur., sec. 1269; 2 White & Tudor's Leading Eq. Cases, 802; *Robinson* v. *Robinson* 11 Beavan, 371; *Mant* v. *Leith* 15 Beavan, 524; *Harris* v. *Harris* 29 id., 107; Hemphill's Appl., 18 Penn. St., 303; Worrall's Appl., 23 id., 44; *Smith* v. *Smith*, 7 J. J. Marsh., 238; *Drosier* v. *Brereton* 16 Beavan, 221; *Mortimore* v. *Mortimore*, 4 De Gex. & J., 472; *Kimbal* v. *Reading*, 11 Foster, 352.

Upon the extent of the discretion, as to investments, left to the executors by the will, he cited *Gray* v. *Fox* Saxton's Rep., 259; *Trafford* v. *Boehm*, *supra*; *Wilkes* v. *Steward* Cooper's Ch. Cases, 6; *Pocock* v. *Redington* 5 Ves., 795; *Harris* v. *Harris*, *supra*; Hill on Trustees, 369.

In this case, the plaintiff's maintenance being charged

upon the interest of the legacy, they are entitled to interest from the death of the testator. (Williams on Ex'ors, 1284; *Beckford* v. *Tobin*, 1 Ves. Sr., 308 ; *Heath* v. *Perry*, 3 Atk., 102; *Incledon* v. *Northcote*, id., 438 ; *Mole* v. *Mole*, 1 Dick., 310 ; *Carey* v. *Austin*, 2 Brown Ch. R., 58; *Cooke* v. *Meeker*, 36 N. Y. R., 15 ; *Lawrence* v. *Embree*, 3 Bradf., 364 ; and at the legal rate, *Ackerman* v. *Mott*, 4 Barb., 628 ; *Dunscomb* v. *Dunscomb*, 1 Johns. Ch. R., 508 ; *Clarkson* v. *Depeyster*, Hopk., 426 ; and it should be computed with annual rests, *Raphael* v. *Boehm*, 13 Ves., 411 ; *Knott* v. *Cottee*, 16 Jur., 752 ; *Montford* v. *Cadogan*, 17 Ves., 485 ; *Schreffelin* v. *Stewart*, 1 Johns. Ch., 627 ; *Ex parte* Baker, 18 Ves., 246 ; *Byrne* v. *Norcott*, 13 Beavan, 336 ; *Barney* v. *Sanders*, 16 How. U. S. R., 542 ; *Bowles* v. *Drayton*, 1 Desau., (Eq.), 489 ; *Edmonds* v. *Crenshaw*, Harper's Eq. R., 224 ; *Fall* v. *Simmons*, 6 Georgia, 271.)

The executors should not be allowed commissions : Hemphill's App'l (*supra*), Worrall's App'l (*supra*), *Depeyster* v. *Clarkson* (*supra*).

Costs should have been given against the trustees on affirmance : *Gray* v. *Thompson*, 1 Johns. Ch., 84 ; *Caffrey* v. *Darby*, 6 Ves., 88 ; *Seers* v. *Hind*, 1 Ves. Jr., 394 ; *Byrne* v. *Norcott* (*supra*) ; *Drosier* v. *Brereton* (*supra*) ; Hill on Trust, 557, 559, note *g*.

WOODRUFF, J.   It is conceded, that in England, the rule is, and has long been settled, that a trustee, holding funds to invest for the benefit of his *cestui que trust*, is bound to make such investment in the public debt, for the safety whereof the faith of their government is pledged; or in loans, for which real estate is pledged as security.   And that, although the terms of the trust commit the investment, in general terms, to the discretion of the trustee, that discretion is controlled by the above rule, and is to be exercised within the very narrow limits, which it prescribes.

As a purely arbitrary rule, resting upon any special policy of that country, or on any peculiarity in its condition, it has

no application to this country. It is not of the common law. It had no applicability to the condition of this country, while a colony of Great Britain, and cannot be said to have been incorporated in our law.

So far, and so far only, as it can be said to rest upon fundamental principles of equity, commending themselves to the conscience, and suited to the condition of our affairs, so far it is true, that it has appropriate application and force, as a guide to the administration of a trust, here, as well as in England.

I do not, therefore, deem it material to inquire, through the multitude of English cases, and the abundant texts of the law writers, into the origin of the rule in England, or the date of its early promulgation. Nor, in this particular case, do I deem it necessary to determine whether it should, by precise analogy, be deemed to prohibit here investments in any other public debt, than that of the State of New York.

Neither, in my judgment, are we at liberty, in the decision of this case, to propound any new rule of conduct, by which to judge of the liability of trustees, now subjected to examination. Under trusts heretofore created, the managers thereof performed their duty with the aid of rules for the exercise of their discretion, which were the utterance of equity and good conscience, intelligible to their understanding, and available for their information; otherwise, trusts heretofore existing, have been traps and pitfalls to catch the faithful, prudent, and diligent trustee, without the power to avoid them.

But it is not true, that there is no underlying principle or rule of conduct in the administration of a trust, which calls for obedience. Whether it has been declared by the courts or not, whether it has been enacted in statutes or not, whether it is in familiar recognition in the affairs of life, there appertains to the relation of trustee and *cestui que trust*, a duty to be faithful, to be diligent, to be prudent in an administration entrusted to the former, in confidence in his fidelity, diligence and prudence.

To this general statement of the duty of trustees, there is

no want of promulgation or sanction, nor want of sources of information for their guidance. In the whole history of trusts, in decisions of courts for a century in England, in all the utterances of the courts of this and the other States of this country, and not less in the conscious good sense of all intelligent minds, its recognition is uniform.

The real inquiry, therefore, is, in my judgment, in the case before us, and in all like cases : Has the administration of the trust, created by the will of Charles W. King, for the benefit of the plaintiff, been governed by fidelity, diligence and prudence ? If it has, the defendants are not liable for losses which, nevertheless, have happened.

This, however, aids but little in the examination of the defendants' conduct, unless the terms of definition are made more precise. What are fidelity, diligence and discretion ? and what is the measure thereof, which trustees are bound to possess and exercise ?

It is hardly necessary to say, that fidelity imports sincere and single intention to administer the trust for the best interest of the parties beneficially interested, and according to the duty, which the trust imposes. And this is but a paraphrase of " good faith."

The meaning and measure of the required prudence and diligence has been repeatedly discussed, and with a difference of opinion. In extreme rigor, it has sometimes been said, that they must be such and as great, as that possessed and exercised by the Court of Chancery itself. And again, it has been said, that they are to be such, as the trustee exercises in the conduct of his own affairs, of like nature, and between these is the declaration, that they are to be the highest prudence and vigilance, or they will not exonerate.

My own judgment, after an examination of the subject, and bearing in mind the nature of the office, its importance, and the considerations, which alone induce men of suitable experience, capacity, and responsibility to accept its usually thankless burden, is, that the just and true rule is, that the trustee is bound to employ such diligence and such prudence in the

care and management, as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs.

This necessarily excludes all speculation, all investments for an uncertain and doubtful rise in the market, and, of course, everything that does not take into view the nature and object of the trust, and the consequences of a mistake in the selection of the investment to be made.

It, therefore, does not follow, that, because prudent men may, and often do, conduct their own affairs with the hope of growing rich, and therein take the hazard of adventures which they deem hopeful, trustees may do the same; the preservation of the fund, and the procurement of a just income therefrom, are primary objects of the creation of the trust itself, and are to be primarily regarded.

If it be said, that trustees are selected by the testator, or donor of the trust, from his own knowledge of their capacity, and without any expectation that they will do more than, in good faith, exercise the discretion and judgment they possess, the answer is: *First*, the rule properly assumes the capacity of trustees to exercise the prudence and diligence of prudent men, in general; and, *second*, it imposes the duty to observe and know, or learn, what such prudence dictates in the matter in hand.

And once more, the terms of the trust, and its particular object and purpose, are, in no case, to be lost sight of in its administration.

Lewin, in his *Treatise on the Law of Trusts, &c.* (p. 332.), states, as the result of the several cases, and as the true rule, that " a trustee is bound to exert *precisely* the *same* care and solicitude in behalf of his *cestui que trust*, as he would do for himself; but *greater* measure than this, a court of equity will *not* exact." In general, this is true, but if it imports that, if he do what men of ordinary prudence would not do, in their own affairs, of a like nature, he will be excused, on showing that he dealt with his own property in like want of discretion, it cannot be sustained, as a safe or just rule towards *cestuis*

*que trust;* nor is it required by reasonable indulgence to the trustee; it would be laying the duty to be prudent out of view entirely, and I cannot think the writer intended it should be so understood.

The Massachusetts cases (9 Pick., 140 ; 20 Pick., 116), cited by the counsel for the defendants, are in better conformity with the rule, as I have stated it.

To apply these general views to the case before us, and with the deductions, which necessarily flow from their recognition : The testator gave to each of his children fifteen thousand dollars, the *interest* on the same, so far as required, to be applied to their maintenance and education, and *the principal*, with any accumulations thereon, to be paid to them severally on their majority ; appointed the defendant, Talbot, and his partner Mr. Olyphant, executors, " entrusting to their discretion the settlement of my affairs and the investment of my estate for the benefit of my heirs."

If I am correct in my views of the duty of trustees, this last clause neither added to, nor in any wise affected the duty or responsibility of these executors ; without it, they were clothed with discretion ; with it, their discretion was to be exercised with all the care and prudence belonging to their trust relation to the beneficiaries. Such is the distinct doctrine of the cases very largely cited by the counsel for the parties, and is, I think, the necessary conclusion from the just rule of duty I have stated.

What, then, was the office of the trustees, as indicated by the terms and nature of the trust ? If its literal reading be followed, it directed, that "fifteen thousand dollars" in money be placed at "interest." The nature of the trust, according to the manifest intent of the testator, required that, in order to the maintenance and support of infant children, whose need, in that regard, would be constant and unremitting, that interest should flow in with regularity and without exposure to the uncertainties or fluctuations of adventures of any kind. And then the fund should continue, with any excess of such

interest accumulated for their benefit, so as to be delivered at the expiration of their minority.

Palpably, then, the *first* and obvious duty was to place that fifteen thousand dollars in a state of security ; *second*, to see to it that it was productive of interest ; and, *third*, so to keep the fund, that it should always be subject to future recall for the benefit of the *cestui que trust*.

I do not attach controlling importance to the word " interest " used by the testator, but I do regard it as some guide to the trustees, as an expression of the testator, that he did not contemplate any adventure with the fund, with a view to profits as such.

But, apart from the inference from the use of that word, I think it should be said, that whenever money is held upon a trust of this description, it is not according to its nature, nor within any just idea of prudence, to place the principal of the fund in a condition, in which, it is necessarily exposed to the hazard of loss or gain, according to the success or failure of the enterprise in which it is embarked, and in which, by the *very terms of the investment*, the principal is not to be returned at all.

It is not denied, that the employment of the fund, as capital in trade, would be a clear departure from the duty of trustees. If it cannot be so employed under the management of a copartnership, I see no reason for saying that the incorporation of the partners tends, in any degree, to justify it.

The moment the fund is invested in bank, or insurance, or railroad stock, it has left the control of the trustees ; its safety and the hazard, or risk of loss, is no longer dependent upon their skill, care, or discretion, in its custody or management, and the terms of the investment do not contemplate that it ever will be returned to the trustees.

If it be said, that, at any time, the trustees may sell the stock, (which is but another name for their interest in the property and business of the corporation), and so re-possess themselves of the original capital, I reply, *that* is necessarily contingent and uncertain ; and so the fund has been volun-

tarily placed in a condition of uncertainty, dependent upon two contingencies : *First,* the practicability of making the business profitable ; and, *second,* the judgment, skill, and fidelity of those, who have the management of it for that purpose.

If it be said, that men of the highest prudence do, in fact, invest their funds in such stocks, becoming subscribers and contributors thereto, in the very formation thereof, and before the business is developed, and in the exercise of their judgment, on the probability of its safety and productiveness, the answer is, so do just such men, looking to the hope of profitable returns, invest money in trade, and adventures of various kinds. In their private affairs, they do, and they lawfully may, put their principal funds at hazard ; in the affairs of a trust they may not. The very nature of their relation to it forbids it.

If it be said, that this reasoning assumes, that it is certainly practicable so to keep the fund, that it shall be productive, and yet safe against any contingency of loss ; whereas, in fact, if loaned upon bond and mortgage, or upon securities of any description, losses from insolvency and depreciation may, and often do happen, notwithstanding due and proper care and caution is observed in their selection. Not at all. It assumes and insists, that the trustees shall not place the fund where its safety and due return to their hands will depend upon the success of the business in which it is adventured, or the skill and honesty of other parties entrusted with its conduct ; and it is in the selection of the securities for its safety and actual return, that there is scope for discretion and prudence, which, if exercised in good faith, constitute due performance of the duty of the trustees.

My conclusion is, therefore, that the defendants were not at liberty to invest the fund bequeathed to the plaintiff, in stock of the Delaware and Hudson Canal Company ; of the New York and Harlem Railroad Company ; of the New York and New Haven Railroad Company ; of the Bank of Commerce ; or of the Saratoga and Washington Railroad Company ; and

that the plaintiff was not bound to accept these stocks, as, and for, his legacy, or the investment thereof.

In regard to the bonds of the Hudson River Railroad Company, and of the Delaware and Hudson Canal Company, it appears by schedule B, given in evidence, that the former were mortgage bonds; but what was the extent or sufficiency of the security afforded by such mortgage, or what property was embraced in it, does not appear, nor does it appear, whether there was any security whatever for the payment of the canal company's bond.

It is not necessary for the decision of this case; and I am not prepared to say, that an investment in the bonds of a railroad, or other corporation, the payment whereof is secured by a mortgage upon real estate, is not suitable and proper, under any circumstances.

If the real estate is ample to ensure the payment of the bonds, I do not, at present, perceive, that it is necessarily to be regarded as inferior to the bond of an individual, secured by mortgage; it would, of course, be open to all the inquiries which prudence would suggest, if the bond and mortgage were that of an individual. The nature, the location, and the sufficiency of the security, and the terms of the mortgage, and its availability for the protection and ultimate realization of the fund, must, of course, enter into the consideration.

But it is not necessary to pursue that subject. The plaintiff, in his complaint, rejects the entire investment. The court below held, that it was equitable that the plaintiff should be held to receive the whole or none of the stocks and bonds, and to that ruling, neither the plaintiff nor the defendants have excepted; and therefore, the question, whether the judgment below was correct in that respect, is not before us.

It is proper, however, to say, that I do not clearly apprehend the propriety of that ruling, unless it be on the ground, that the plaintiff, in his complaint, did so elect.

The rule is perfectly well settled, that a *cestui que trust* is at liberty to elect to approve an unauthorized investment, and enjoy its profits, or to reject it at his option; and I perceive

no reason for saying, that where the trustee has divided the fund into parts and made separate investments, the *cestui que trust* is not at liberty, on equitable as well as legal grounds, to approve and adopt such as he thinks it for his interest to approve. The money invested is his money; and in respect to each and every dollar, it seems to me, he has an unqualified right to follow it, and claim the fruits of its investment, and that the trustee cannot deny it. The fact, that the trustee has made other investments of other parts of the fund, which the *cestui que trust* is not bound to approve, and disaffirms, cannot, I think, affect the power. For example, suppose, in the present case, the *cestui que trust*, on delivery to him of all the securities and bonds in which his legacy had appeared invested, had declared: Although these investments are improperly made, not in accordance with the intent of the testator, nor in the due performance of your duty, I waive all objection on that account, except as to the stock of the Saratoga and Washington Railroad Company. That, I reject and return to you. Is it doubtful, that his position must be sustained ?

The result is, that the main features of the judgment herein must be affirmed.

The testator died abroad September 26, 1845. The will was proved in Chancery October 30th, 1846, and letters testamentary were issued December 5, 1846, and the inventory of the estate made and filed the 16th day of December, 1847. It is expressly found by the court, that the executors did not collect, or have in their hands for investment, a sum sufficient to pay the three legacies in question, until June 9th, 1847. No fault or negligence is imputed to the executors in this respect. The trustees were, therefore, not under any duty to make the investment of the legacies before that time.

The question, whether these legacies bore interest, as a provision for the support of children dependent thereon for their maintenance, is a very different question from the inquiry, whether, as trustees, the executors were chargeable with interest, as income from the legacy itself.

As between the children and the estate, the legacies unquestionably bore interest from the death of the testator; but as between them and the trustees of the legacy, only from the time when the legacy, as such, was or ought to have been invested.

Whatever sums, therefore, the executors paid to the mother of these children for their support and maintenance, was properly charged to the children, and it. is not of the slightest importance, whether it was paid under the name of payment for their support, or as residuary estate, upon which it was properly chargeable.

Had the trustees of the legacy been other and different persons from the executors, I do not perceive, that the latter could have refused to pay to the trustees, out of the estate in their hands, interest on the legacy, until they were prepared to pay it over for investment.

Interest should, therefore, be allowed upon the legacy from the death of the testator. It is payable out of the estate, irrespective of the question whether the estate was itself producing income in the hands of the executors, and as against the executors as such, it should be allowed, only down to June 5th, 1847, when there were funds to be paid over and invested as and for the plaintiff's legacy. But, as the executors and trustees are the same, there is no occasion to make a rest at that date; it should be assumed in the trustees' account, that the interest was received annually.

I think it entirely clear, that the account should be stated with annual rests. So nearly as may be, the plaintiff is entitled to such benefit, as he would have derived from an investment of his legacy. The testator expressly directs, that -the surplus of interest, not required for maintenance, be accumulated. This devolved on the trustees the duty to invest such surplus, from year to year. Had the trustees made the investment of the principal in the manner, which I think was their duty, and it had appeared that small amounts of surplus income necessarily remained unproductive in their, hands, such necessity would excuse them from any charge for

interest thereon; they would not be charged for income, which by reasonable diligence they could not obtain; but the duty to invest being clear, we have no alternative, in the absence of such actual investment, but to treat the invest- ment, for the purposes of the accounting, as made when it ought to have been made, i. e., at the end of each year.

The manner in which the account was stated by the court below, unless I misunderstand it, rendered it not only proper, but necessary, to allow interest upon the payments made by the executors for maintenance, for by making the whole annual income bear interest from the moment it was received (or, as a charge to the trustees, became due, which is the same thing), the payments, in each year, were practically made advances, in anticipation of the interest, which would be pay- able at the end of that year; and, therefore, as the trustees were charged interest on the previously accrued income, out of which maintenance was to be provided, that charge must be counterbalanced by an allowance of interest, *pro tanto*, for so much as was applied to maintenance.

The principle, for which the plaintiff contends, is unques- tionably correct, viz.: That, at no time, when the trustees make payments for maintenance, with income in hand, not bearing interest, should they be allowed interest on such payments.

The accurate and just mode of stating the accounts, is to credit the plaintiff, on the day of the decease of the testator, September 26, 1845, with the amount of the legacy. At the end of the year, interest will have accrued for twelve months, to be then, i. e., September 26, 1846, credited. Any payments for support, during that twelve months, should be regarded as an advance, and should, therefore, bear interest, and on the 26th September, 1846, the balance being struck, it will appear how much of income remains for the support of plaintiff, for the ensuing year. But, as that, or a then unknown portion thereof, will be required during such ensuing year, the trustees would not, had it been received from actual loans, duly made, be required to invest it, but to retain it for such support. If, however, at the end of such year, i. e., September 26, 1847,

any portion of it remained unexpended, then such remainder should be added to the principal, for accumulation, and bear interest. On that same date, September 26, 1847, the interest for the year ending that day will have accrued, and that, in turn, should be held for the support of the plaintiff, for the year immediately ensuing; at the end of which, to wit: September 26, 1848, if any remained, such remainder should be added to the principal, as an accumulation.

The rule being, that advances for support, without income in hand, should bear interest; advances for support, with income in hand, should not bear interest; and the income becoming due at the end of the year is not to be forthwith invested, or made to bear interest, but may properly be held by the trustees, to meet the charge for the support of the plaintiff, for the then coming year; and if any portion thereof remained at its end, such remainder should then, and not till then, be carried to principal, and bear interest. Assuming the items correct, as they appear in the account stated by the referee, this will entitle the defendants to be credited in the years 1846, 1847, 1848, 1849, and in 1850, 1864, and 1865, on the excess of their payments for support, over the amount of uninvested income in their hands, at the beginning of the year.

I am aware that the mode of keeping the account among merchants, is to charge interest on both sides of the account; but the plaintiff insists that this makes him pay interest for his support, when the trustees have income in hand. The mode of stating the account I have proposed, is, I think, literally just and exact, and is not liable to any such criticism.

The remaining inquiry is, at what rate should interest be charged?

The view, which I have taken, is strict in holding the defendants to an exact discharge of their duty. But it does not forbid, and ought not to prevent a recognition of their entire good faith and perfect rectitude of purpose in the entire administration. This is found by the court, and the evidence leaves no room to question their sincerity in the

Opinion of the Court, per Woodruff, J.

exercise of the discretion, which they believed was committed to them, nor that they have been governed, throughout, by a desire to secure and promote the best interests of the infant children of their deceased partner and friend.

With what is termed the ungracious aspect of this prose cution by those, for whom they assumed what is very often an irksome and thankless office, we cannot deal. But we may and ought to say, that no imposition, in any wise in the nature of a penalty, should be permitted.

Where the failure of a trustee in his duty is wilful, or characterized by bad faith, the highest rate of interest should be imposed. But where good faith and honest mistake concur, the rate of interest rests in a discretion, that permits the consideration of all the circumstances, which show that substantial justice can be done to the *cestui que trust*, by allowing a less rate.

Hence, in such case, we may not close our eyes to the fact, that in a long course of years, such as are now under consideration, there are periods in which it is impracticable to realize on investments, which give the requisite assurance of safety, the highest interest allowed by law. That loans, for long periods, will rarely be taken, on such security, at the highest rate.

That, in a commercial community like our own, fluctuations are frequent and large, and especially, that in the management of funds of considerable amount, there must necessarily be intervals when funds lie idle, seeking investment, notwithstanding all reasonable diligence on the part of the trustees.

These and like considerations have led the Court of Chancery in England to charge the executor with, not exceeding, four per cent, where he has acted in good faith, and has not himself realized a greater profit, the legal rate of interest being five per cent; and I think there is nothing in *Ackerman* v. *Emott* (4 Barb., S. C. R., 628); *Dunscomb* v. *Dunscomb* (1 Johns. Ch., 508); or *Clarkson* v. *Depeyster* (Hopk. Ch R., 426), that forbids their due weight in our decision.

My conclusion on this point is, that the trustees are not justly chargeable with more than six per cent. That conviction is strengthened by the fact, that the stocks of the United States, which the counsel for the plaintiff concedes would have been a proper security, do not, in the absence of the present extraordinary condition of our affairs, yield a higher rate; and it is at least doubtful whether, during many years of the continuance of this trust, these stocks could have been had without the payment of a premium, which would have reduced the income still lower.

There is no ground for withholding commissions. Even in cases of misconduct or gross negligence, it is, at least, doubtful, whether the settled rule in this State would not require the allowance of commissions; and where no imputation of this rests upon the trustees, their title to commissions is in no doubt. (See *Vanderheyden* v. *Vanderheyden*, 2 Paige, 288; *Rapelje* v. *Norsworthy's Executors*, 1 Sandf. Ch. R., 406; *Meacham* v. *Sterns*, 9 Paige, 405.)

It is not very material to notice an apparently palpable error in the judgment, except to call the attention of counsel to it in the future. The account stated by the referee contains a credit to the defendants of $128.95, paid for income tax in October, 1865; and the apparent amount to the credit of the plaintiff in that account ($26,964.27) is subject to abatement for that payment; and nevertheless the judgment was entered for the full sum of $26,964.27, without allowing the credit for that income tax, although the referee had credited it to the defendant, he not having made the actual deduction.

The decree herein should be modified to conform to the foregoing views, with a direction to state the account accordingly; and in other respects it should be affirmed, without costs on this appeal.

The same principles should govern the disposition of the other two cases: *Anna Henrietta King*, respondent, v. *The Same*, appellants; and *Charlotte E. King*, executrix, &c., respondent, v. *The Same*, appellants.

I do not understand that any other questions are involved in them, which are not considered in the foregoing opinion.

All the judges concur in the result to which Judge WOOD-RUFF arrived.

MURRAY, J., thought it a settled principle of law, in this State, that a trustee, holding trust funds, for investment for the benefit of minor children, must invest in Government or real estate securities, and that any other investment would be a breach of duty, and the trustee would be personally liable for any loss. GROVER, DANIELS, and JAMES, JJ., concurred. HUNT, Ch. J., MASON and LOTT, JJ., *contra.*

LOTT, J., was inclined to the opinion that the interest should be but five per cent, with annual rests, upon the principle suggested in *Williamson* v. *Williamson,* 6 Paige, 306.

Decrees affirmed, with the modifications indicated in the opinion of WOODRUFF, J., without costs of appeal.